# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo |
| v. | : | |
| | : | Mag. No. 14-8079 (MCA) |
| STEVEN METRO | : | |
| and | : | **CRIMINAL COMPLAINT** |
| VLADIMIR EYDELMAN | : | |

I, Stephanie R. Davis, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Stephanie R. Davis, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 18, 2014                    at        Newark, New Jersey
Date                                                  City and State

Honorable Madeline Cox Arleo
United States Magistrate Judge
Name and Title of Judicial Officer              Signature of Judicial Officer

## ATTACHMENT A

## COUNT 1
### (Conspiracy to Commit Securities Fraud and Tender Offer Fraud)

From in or about February 2009 through the present, in the District of New Jersey and elsewhere, defendants

### STEVEN METRO
and
### VLADIMIR EYDELMAN

did knowingly and willfully combine, conspire and agree with each other and others to commit offenses against the United States, namely:

a.      securities fraud, by using and employing by the direct and indirect use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, manipulative and deceptive devices, including the purchases and sales of securities of issuers on the basis of material nonpublic information about those securities and issuers, in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively, to the issuers of those securities, the shareholders of those issuers, and to other persons who are the source of the material nonpublic information, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and

b.      tender offer fraud, by engaging in fraudulent, deceptive, and manipulative acts and practices, in connection with tender offers, in that, after the offering persons had taken substantial steps to commence the tender offers, defendants STEVEN METRO and VLADIMIR EYDELMAN, while in possession of material information relating to such tender offers, which information they knew and had reason to know was nonpublic and had been acquired directly and indirectly from the offering person, from the issuer of the securities sought and to be sought by such tender offers, and any officer, director, partner, and employee and any other person acting on behalf of the offering persons and such issuers, purchased and sold and caused to be purchased and sold such securities, and securities convertible into or exchangeable for any such securities, and an option and right to obtain and to dispose of any of the foregoing securities, without first publicly disclosing such information and its source by press release and otherwise, contrary to Title 15, United State Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Section 240.14e-3(a).

## Overt Acts

In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

1.      In or about December 2009, defendant STEVEN METRO ("METRO") obtained inside information through his employment at the law firm Simpson Thacher & Bartlett LLP concerning plans by Tyco International Ltd. to acquire Brinks Home Security (the "Tyco-Brinks Deal"), and shared the inside information with an individual who subsequently became a cooperating witness (the "CW").

2.      In or about December 2009, the CW passed the inside information of the Tyco-Brinks Deal to his broker-dealer, defendant VLADIMIR EYDELMAN ("EYDELMAN"), explaining that he had obtained the inside information from a source inside a law firm.

3.      Between on or about December 31, 2009 and on or about January 15, 2010, defendant EYDELMAN then used the inside information from the CW's law firm source, i.e., defendant METRO, to trade illegally in Brinks securities on behalf of himself, certain family members and friends, and various clients, including the CW.

In violation of Title 18, United States Code, Section 371.

## COUNTS 2 Through 10
### (Securities Fraud – Insider Trading)

On or about the dates set forth below, in the District of New Jersey and elsewhere, defendants

### STEVEN METRO
### and
### VLADIMIR EYDELMAN

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 (Rule "10b-5") in connection with the purchases and sales of securities by (a) employing devices, schemes, and artifices to defraud members of the investing public; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon persons, in that they executed and caused the execution of the securities transactions listed below based upon the material, nonpublic information defendant STEVEN METRO obtained through his employment at the law firm, Simpson Thacher & Bartlett LLP, and elsewhere:

| COUNT | DEFENDANT(S) | APPROX. DATE(S) | SECURITIES TRANSACTION(S) |
|---|---|---|---|
| 2 | STEVEN METRO | 2/12/2009-2/13/2009 | Purchases of approximately 350,000 shares of Sirius stock. |
| 3 | STEVEN METRO VLADIMIR EYDELMAN | 12/29/2009-1/15/2010 | Purchases of approximately 50,916 shares of Brinks stock and approximately 460 call options. Sales of approximately 160 put options. |
| 4 | STEVEN METRO VLADIMIR EYDELMAN | 7/8/2010-7/15/2010 | Purchases of approximately 220,240 shares of Smithtown Bancorp stock. |
| 5 | STEVEN METRO VLADIMIR EYDELMAN | 4/11/2011-4/12/2011 | Purchases of approximately 25,750 shares of Graham Packaging stock. |
| 6 | STEVEN METRO VLADIMIR EYDELMAN | 1/31/2011-4/19/2011 | Purchases of approximately 947,150 shares of SMART Modular Technologies stock and approximately 450 call options. Sales of approximately 1,150 put options. |

| 7 | STEVEN METRO VLADIMIR EYDELMAN | 4/16/2012- 4/20/2012 | Purchases of approximately 98,800 shares of Collective Brands stock and approximately 3,655 call options.  Sale of approximately 50 put options. |
|---|---|---|---|
| 8 | STEVEN METRO VLADIMIR EYDELMAN | 5/14/2012- 10/1/2012 | Purchases of approximately 627,815 shares of "Company A" stock and approximately 10,825 options. |
| 9 | STEVEN METRO VLADIMIR EYDELMAN | 9/20/2012- 9/25/2012 | Purchases of approximately 214,000 shares of Sealy stock. |
| 10 | STEVEN METRO VLADIMIR EYDELMAN | 1/31/2013- 2/15/2013 | Purchases of approximately 151,100 shares of Officemax stock and approximately 2,010 call options. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**COUNTS 11 Through 14**
**(Tender Offer Fraud)**

On or about the dates set forth below, in the District of New Jersey and elsewhere, defendants

**STEVEN METRO**
**and**
**VLADIMIR EYDELMAN**

knowingly and willfully engaged in fraudulent, deceptive, and manipulative acts and practices, in connection with tender offers, in that, after the offering persons had taken substantial steps to commence the tender offers, defendants STEVEN METRO and VLADIMIR EYDELMAN, while in possession of material information relating to such tender offers, which information they knew and had reason to know was nonpublic and had been acquired directly and indirectly from the offering person, from the issuer of the securities sought and to be sought by the tender offer, and from an officer, director, partner, employee, and any other person acting on behalf of the offering person and of the issuer of such securities, purchased and sold, and caused to be purchased and sold, such securities, without first publicly disclosing such information and its source, as specified in each count below:

| COUNT | DEFENDANT(S) | APPROX. DATE(S) | SECURITIES TRANSACTION(S) |
|-------|--------------|-----------------|----------------------------|
| 11 | STEVEN METRO VLADIMIR EYDELMAN | 10/20/2010- 10/29/2010 | Purchases of approximately 63,750 shares of CNA Surety stock. |
| 12 | STEVEN METRO VLADIMIR EYDELMAN | 4/4/2011- 4/21/2011 | Purchases of approximately 19,000 shares of Vital Images stock. |
| 13 | STEVEN METRO VLADIMIR EYDELMAN | 4/29/2011 | Purchases of approximately 68,500 shares of International Coal Group stock. |
| 14 | STEVEN METRO VLADIMIR EYDELMAN | 6/21/2011- 8/22/2011 | Purchases of approximately 695,650 shares of PharMerica stock and approximately 1,511 call options. |

In violation of Title 15, United States Code, Sections 78n(e) and 78ff, Title 17, Code of Federal Regulations, Section 240.14e-3(a), and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1.      The allegations contained in all paragraphs of all counts of this Complaint are incorporated by reference as though set forth in full herein for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

2.      The United States hereby gives notice to the defendants that, upon conviction of the offenses charged in the Counts 1 through 14 of the Complaint, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the violations of Title 15, United States Code, Sections 78j(b), 78n(e), and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.14e-3(a); and Title 18, United States Code, Section 371, alleged in Counts 1 through 14 of this Complaint, including but not limited to the following:

   All right, title, and interest, including all appurtenances and improvements thereon, in the real property located at 3 Fulling Mill Lane, Colts Neck, New Jersey, further identified on the Colts Neck Township Tax Map as Block 8, Lot 6.05.

3.      If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third party,

   c.  has been placed beyond the jurisdiction of the court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be subdivided without difficulty,

the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in paragraph 2, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

## ATTACHMENT B

I, Stephanie R. Davis, have been a Special Agent with the Federal Bureau of Investigation ("FBI") for more than three years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information relating to the companies and individuals referenced herein; (c) information provided to law enforcement by the U.S. Securities and Exchange Commission; and (d) documents, including bank records, brokerage records, business records, phone records, email records, and other information obtained from various entities. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, dates and times are reported herein, they are approximate.

## OVERVIEW OF THE INSIDER TRADING SCHEME

1.     As set forth in more detail below, there is probable cause to believe that defendant STEVEN METRO ("METRO"), defendant VLADIMIR EYDELMAN ("EYDELMAN"), an individual who subsequently began cooperating with law enforcement (the "CW")[1], and others engaged in an insider trading scheme from in or about February 2009 to the present, where they invested, on behalf of themselves and/or others, approximately $33 million, and netted more than $5.6 million in illicit profits based on inside information obtained by defendant METRO through the course of his employment at Simpson Thacher & Bartlett LLP (the "Law Firm").

2.     According to information provided by the CW, between in or about February 2009, when defendant METRO first provided inside information to the CW, and continuing through in or about January 2013, when defendant METRO last tipped the CW, the coconspirators exhibited the same general pattern of conduct. First, defendant METRO obtained confidential, material nonpublic information regarding certain planned mergers, acquisitions, and tender offers[2] through his employment at the Law Firm (the "Inside Information"). Defendant METRO then provided the Inside Information to the CW in person, usually meeting at a bar or coffee shop located near their respective workplaces in midtown Manhattan. During such meetings, defendant METRO provided the CW Inside Information pertaining to, among other things, the name and/or ticker symbol of the company or companies whose securities should be purchased, the general timing of the planned deal(s), and information related to how the deal(s)

---

[1] The CW is a coconspirator not named as a defendant herein who, directly or indirectly, executed securities transactions based on material, nonpublic information. The CW is cooperating with the expectation that the CW will enter into plea and cooperation agreements with the Government and, after pleading guilty to trading based on Inside Information, potentially receive a reduction in his sentence based on his cooperation. The CW has been cooperating with the FBI since in or about December 2013. The information the CW has provided has been corroborated by, among other things, trading records, pen register data, telephone records, text messages, and email communications.

[2] A "tender offer" is an offer to purchase some or all of shareholders' shares in a corporation. The price offered is usually at a premium to the market price.

would affect the stock price once announced.  After receiving the Inside Information from defendant METRO, the CW then would write down the ticker symbol(s) of the company or companies whose securities should be purchased on a small piece of paper or on a napkin.

3.      According to the CW, after receiving the Inside Information, the CW then would call defendant EYDELMAN to set up a meeting near the large clock inside the main terminal of Grand Central Station in New York, New York (the "Grand Central Clock"), generally the same day on which the CW received the particular Inside Information from defendant METRO.  In setting up the meeting, the CW would relate to defendant EYDELMAN, in substance and in part, that the CW had information that could not be discussed over the phone.  Defendant EYDELMAN generally understood that reference to mean that the CW had Inside Information to relay to him from the CW's law firm source, i.e., defendant METRO.  At the Grand Central Clock, the CW then would pass the Inside Information to defendant EYDELMAN, by showing EYDELMAN the piece of paper or napkin with the relevant ticker symbol(s) that the CW had obtained from defendant METRO written on it, allowing EYDELMAN to commit the ticker symbol(s) to memory.  The CW also would verbally provide defendant EYDELMAN any Inside Information the CW had received from his law firm source, i.e., defendant METRO, regarding the timing and/or pricing of the planned transaction(s).

4.      According to the CW, the CW then would fold up the paper or napkin with the ticker symbol(s) written on it, place it into his mouth, and chew the paper or napkin to destroy it. After meeting with the CW at the Grand Central Clock to obtain the Inside Information, defendant EYDELMAN then would trade in the securities of the subject company or companies, aggressively purchasing shares and/or trading in options[3] of the issuer(s) on behalf of himself, his family member(s), his friend(s), the CW, and/or other brokerage clients, prior to the public announcement of the deal(s).  Defendant EYDELMAN then would sell those shares and/or cover the options positions shortly after the public announcement of the deal(s), reaping millions of dollars in collective profits over the course of the insider trading scheme.  The CW also, at times, advised one or more friends to trade in the subject securities, and also utilized Inside Information to execute trades on behalf of the CW's girlfriend and the CW's family member.

5.      With a few exceptions, defendant METRO generally did not trade in the subject securities himself; rather, defendant METRO agreed with the CW that his share of the profits from the first tip that he provided would be reinvested by the CW in their subsequent insider trading via the CW's broker-dealer, defendant EYDELMAN.  During the course of the insider trading scheme, the CW apprised defendant METRO of the running balance of METRO's share of the profits, which balance the CW recently informed METRO had reached approximately $168,000 as of in or about October 2013.

---

[3] Defendant EYDELMAN traded in both call options and put options based on Inside Information.  A "call option" is an agreement that gives an investor the right to purchase shares of a particular stock at a predetermined price within a specific time period.  For investors who think the stock price will increase significantly, call options permit a profit from a smaller investment than it would take to buy the stock.  A "put option" is an agreement that gives an investor the right to sell, i.e., "write," a specific number of shares at a predetermined price within a specific time period.  An investor who sells put options expects that the share price will not decrease beyond the contract price paid for the put option.  Where an investor both buys call options and sells put options of the same security, the investor expects a dramatic increase in the stock price.

## RELEVANT ENTITIES AND INDIVIDUALS

6.     At all times relevant to this Complaint unless otherwise indicated:

    a.     Starting in or about November 1999 and continuing through in or about March 2014, defendant METRO, a resident of Katonah, New York, was employed in the New York office of Simpson Thacher & Bartlett LLP, i.e., the Law Firm.  During the time period of the insider trading scheme, defendant METRO was employed as the Law Firm's managing clerk and, as such, was responsible for, among other things, filing pleadings on behalf of attorneys at the Firm.  Through his employment, defendant METRO obtained access to, among other things, Inside Information related to corporate transactions, such as mergers and acquisitions or tender offers, in which the Law Firm represented a party or financial advisor to the transaction. Defendant METRO had a duty not to disclose the Inside Information that he accessed through his employment at the Law Firm, or to use such information for his personal benefit or the benefit of others.

    b.     Simpson Thacher & Bartlett LLP was an international law firm based in New York, and was one of the world's preeminent law firms in public and private merger and acquisition ("M&A") transactions.  The Law Firm's work involved the representation of M&A participants in a variety of capacities, including purchasers, sellers, lenders, and financial advisors.

    c.     The CW, a resident of Brooklyn, New York, was a mortgage broker and a personal friend of defendant METRO.

    d.     Defendant EYDELMAN, a resident of Colts Neck, New Jersey, was the CW's broker-dealer.  From in or about 2001 through in or about August 2012, defendant EYDELMAN was employed by Oppenheimer & Co. Inc. ("Oppenheimer"), an investment bank and full-service investment firm, as a broker-dealer registered with the SEC.  Starting in or about September 2012 through in or about March 2014, defendant EYDELMAN was employed by the global financial services firm Morgan Stanley as a registered broker-dealer.

    e.     The securities purchased and/or sold by defendant METRO, defendant EYDELMAN, the CW, and others in connection with the insider trading scheme were listed on the NASDAQ Stock Market ("NASDAQ") and/or the New York Stock Exchange ("NYSE").

    f.     NASDAQ was the largest electronic equity securities trading market in the United States and was the second largest equities-based exchange in the world based on market capitalization.  NASDAQ did not have a central trading floor.  Instead, it relied on computer servers to facilitate all trading activity.  Since at least 2006, NASDAQ maintained computer servers in Carteret, New Jersey.

    g.     NYSE was the largest equities-based exchange in the world based on total market capitalization of its listed securities.  By in or about August 2010, all of NYSE's trade processing and data services were performed at its U.S. data center in Mahwah, New Jersey.

    h.     At various times while employed as a broker-dealer at Oppenheimer, and then at Morgan Stanley, defendant EYDELMAN worked from his home office in Colts Neck,

New Jersey; and, during at least one of the instances of insider trading described herein, defendant EYDELMAN caused the execution of certain subject trades and/or communicated with the CW from his residence in New Jersey.

## ILLICIT TRADING BASED ON THE LAW FIRM'S INSIDE INFORMATION

*The Sirius Bailout (Announced February 17, 2009)*

7.      According to information provided by the CW, the insider trading scheme started in or about February 2009, when defendant METRO met with the CW and others at a New York City bar.  Defendant METRO separated from the group to have a private conversation with the CW.  During this conversation, defendant METRO informed the CW, in substance and in part, of a potential, then-confidential bailout by Liberty Media (NASDAQ: "LMCA") of Sirius XM Radio (NASDAQ: "SIRI") ("Sirius")[4], which was then on the verge of bankruptcy (the "Sirius Bailout").  Defendant METRO noted to the CW, in substance and in part, that he could not personally trade in SIRI securities because he had obtained the Inside Information through his employment at the Law Firm.

8.      Shortly thereafter, the CW, who already owned Sirius stock, called his broker-dealer, defendant EYDELMAN, and instructed him to purchase additional shares of the stock.  Defendant EYDELMAN, in substance and in part, informed the CW that making an additional investment in Sirius was unwise because the company was going bankrupt.  In response, the CW informed defendant EYDELMAN, in substance and in part, that he had a "source" who had alerted him that Sirius was being bailed out.

9.      Based on the Inside Information from the CW's "source," i.e., defendant METRO, defendant EYDELMAN purchased a total of approximately 300,000 shares of SIRI stock on behalf of the CW, on or about February 12 and February 13, 2009.

10.      On or about February 17, 2009, the Sirius Bailout was publicly announced with news that Liberty Media had agreed to loan Sirius approximately $530 million to help pay off Sirius' substantial debt and to avoid bankruptcy.  News of the bailout caused the stock price of Sirius to increase from the prior trading day's closing price of approximately 13 cents per share to approximately 16 cents per share on the date of the announcement.  The price of Sirius stock continued to rise in the weeks following the bailout announcement, reaching approximately 50 cents per share on or about April 13, 2009.

11.      By purchasing additional shares of SIRI stock based on the Inside Information pertaining to the Sirius Bailout and liquidating shares of SIRI after the bailout announcement, defendant EYDELMAN caused the CW to make a profit of approximately $157,892.

12.      Defendant EYDELMAN also caused another client to purchase approximately 50,000 shares of SIRI stock based on the Inside Information from the CW's "source," i.e.,

---

[4] For each of the subject transactions, the participating companies' respective NYSE or NASDAQ ticker symbols are noted in parentheses.

defendant METRO.  Defendant EYDELMAN caused this client to reap approximately $54,922 in profits by selling numerous shares of the client's SIRI stock after the bailout announcement.

*The Tyco-Brinks Deal (Announced January 18, 2010)*

13.     Based on information provided by the CW, the insider trading scheme continued into in or about December 2009, when defendant METRO, the CW, and a group of their friends met to socialize at a New York City bar.  Defendant METRO broke off from the group for a private conversation with the CW.  During this private conversation, defendant METRO informed the CW, in substance and in part, of an upcoming deal involving Tyco International Ltd.'s acquisition of Brinks Home Security (the "Tyco-Brinks Deal").  At the time, the CW understood that defendant METRO had obtained the Inside Information related to the deal from the Law Firm where defendant METRO worked.

14.     According to the CW, defendant METRO provided to the CW specific Inside Information relating to the timing and pricing of the Tyco-Brinks Deal.  For example, defendant METRO advised the CW, in substance and in part, that the deal would close in early 2010, at which point the price of Brinks shares would rise approximately 20% above the company's thirty-day average stock price.

15.     Based on information from the CW, defendant METRO requested compensation from the CW for the Inside Information related to the Tyco-Brinks Deal.  In response, the CW stated, in substance and in part, that the CW had profited from trading based on the Sirius Bailout tip and that the CW had set aside, in the CW's retirement brokerage account, approximately $7,000 of these profits for defendant METRO.  When the CW asked defendant METRO how he wanted to be paid from these funds, defendant METRO stated, in substance and in part, that he wanted the CW to reinvest, or "roll over," his share of the profits by purchasing shares of Brinks stock on behalf of defendant METRO.

16.     After receiving the Inside Information related to the Tyco-Brinks Deal from defendant METRO, the CW called his broker-dealer, defendant EYDELMAN, and informed defendant EYDELMAN, in substance and in part, that he had received certain stock information from his "source," but that the CW could not discuss the information over the phone.  Defendant EYDELMAN agreed to meet with the CW in person to receive the stock tip, suggesting to the CW that they meet at the Grand Central Clock.

17.     As agreed, defendant EYDELMAN met with the CW near the Grand Central Clock sometime in or about December 2009 to receive the Inside Information from the CW, which information defendant EYDELMAN understood at that time to be from a source who worked at a law firm.  During this meeting, the CW showed defendant EYDELMAN a piece of paper or napkin with the ticker symbol of the stock that defendant METRO had informed the CW to purchase – i.e., "CFL" for Brinks Home Security.  After providing defendant EYDELMAN the opportunity to memorize the ticker symbol, the CW folded the paper or napkin, placed it in his mouth, and chewed the evidence to destroy it.

18.     Defendant EYDELMAN used the Inside Information from the CW's law firm source, i.e., defendant METRO, to trade illegally in Brinks securities on behalf of himself,

certain family members and friends, as well as several of his brokerage clients, including the CW. Specifically, between on or about December 31, 2009 and on or about January 15, 2010, defendant EYDELMAN caused the purchase of more than 50,000 shares of Brinks stock and approximately 460 call options, as well as the sale of approximately 160 put options.

19.    In addition to tipping defendant EYDELMAN about the Tyco-Brinks Deal, the CW separately tipped a friend ("Trader 1"), who purchased hundreds of shares of CFL prior to the public announcement of the deal.

20.    By executing trades based on the Inside Information in the weeks leading up to the public announcement of the Tyco-Brinks Deal on or about January 18, 2010, and selling the purchased shares and/or covering the options positions shortly after the public announcement, defendant EYDELMAN, certain family members and friends of EYDELMAN, several of his brokerage clients, including the CW, and Trader 1 reaped profits collectively totaling more than approximately $700,000.

21.    In addition, defendant METRO personally traded in CFL securities for a profit, after personally working on the deal at the Law Firm.

22.    After defendant EYDELMAN, his family members, and several of his brokerage clients, including the CW, realized substantial profits from trading in options and other CFL securities ahead of the deal announcement, defendant EYDELMAN was questioned by the compliance department of his then-employer, Oppenheimer, regarding the transactions. In response to the compliance inquiry, defendant EYDELMAN claimed, in substance and in part, that he had an independent justification for executing the transactions, namely market-based research supporting the trades.

*The People's United-SMTB Deal (Announced July 15, 2010)*

23.    In or about July 2010, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by People's United Financial Inc. (NASDAQ: "PBCT") to acquire Smithtown Bancorp (NASDAQ: "SMTB") (the "People's United-SMTB Deal") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

24.    Also in or about July 2010, the CW then passed the Inside Information of the People's United-SMTB Deal to defendant EYDELMAN, so that defendant EYDELMAN could conduct trades in SMTB securities on behalf of the CW. In addition, the CW tipped a business associate about the deal, and this business associate likewise traded in SMTB securities in advance of the public announcement of the deal, purchasing approximately 5,000 shares of SMTB stock.

25.    Based on the Inside Information related to the then-confidential People's United-SMTB Deal, defendant EYDELMAN illegally traded in SMTB securities on behalf of himself, a family member, and several of his brokerage clients, including the CW. In total, between on or about July 8 and July 15, 2010, just hours before the public announcement of the deal, defendant EYDELMAN caused the purchase of approximately 214,700 shares of SMTB stock.

26.     In total, defendant EYDELMAN, his family member, and several of his brokerage clients, including the CW, made approximately $29,000 in illicit profits from trading in SMTB securities based on the Inside Information obtained by defendant METRO.

*The CNA Tender Offer (Announced November 1, 2010)*

27.     In or about October 2010, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by CNA Financial Corporation (NYSE: "CNA") to acquire the outstanding shares of CNA Surety Corporation (NYSE: "SUR") in a cash tender offer (the "CNA Tender Offer") and divulged that information to the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the tender offer.

28.     Also in or about October 2010, the CW then passed the Inside Information of the CNA Tender Offer to defendant EYDELMAN, so that he could conduct trades in SUR securities on behalf of the CW.

29.     Based on the Inside Information related to the then-confidential CNA Tender Offer, defendant EYDELMAN illegally traded in SUR securities on behalf of himself and several of his brokerage clients, including the CW. Defendant EYDELMAN also tipped one or more of his associates about the deal, who also traded in SUR securities. In total, between on or about October 20 and October 29, 2010, the last trading day prior to the public announcement of the tender offer, defendant EYDELMAN caused the purchase of approximately 63,750 shares of SUR stock.

30.     In total, defendant EYDELMAN, his associate(s), and his clients, including the CW, made approximately $240,000 in illicit profits from trading in SUR securities based on the Inside Information obtained by defendant METRO.

*The Silgan-Graham Packaging Deal (Announced April 13, 2011)*

31.     In or about April 2011, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Silgan Holdings Inc. (NASDAQ: "SLGN") to acquire Graham Packaging Company Inc. (NYSE: "GRM") (the "Silgan-Graham Packaging Deal") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

32.     Also in or about April 2011, the CW then passed the Inside Information of the Silgan-Graham Packaging Deal to defendant EYDELMAN, so that he could conduct trades in GRM securities on behalf of the CW. In addition, the CW tipped his friend, Trader 1, about the deal, who purchased approximately 1,750 shares of GRM prior to the public announcement of the deal.

33.     Based on the Inside Information related to the then-confidential Silgan-Graham Packaging Deal, defendant EYDELMAN illegally traded in GRM securities on behalf of several of his brokerage clients, including the CW. In total, between on or about April 11 and April 12,

2011, just one day before the public announcement of the deal, defendant EYDELMAN caused the purchase of approximately 24,000 shares of GRM stock.

34.     In total, defendant EYDELMAN's clients, including the CW, and Trader 1 made approximately $105,000 in illicit profits from trading in GRM securities based on the Inside Information obtained by defendant METRO.

*The Silver Lake-SMART Deal (Announced April 26, 2011)*

35.     In or about late January 2011, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Silver Lake, a private equity firm, to acquire SMART Modular Technologies (NASDAQ: "SMOD") (the "Silver Lake-SMART Deal") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

36.     Also in or about late January 2011, the CW then passed the Inside Information of the Silver Lake-SMART Deal to defendant EYDELMAN, so that he could conduct trades in SMOD securities on behalf of the CW. In addition, the CW tipped his friend, Trader 1, about the deal, who purchased approximately 8,000 shares of SMOD prior to the public announcement of the deal.

37.     Based on the Inside Information related to the then-confidential Silver Lake-SMART Deal, defendant EYDELMAN illegally traded in SMOD securities on behalf of himself, a family member, and several of his brokerage clients, including the CW. Defendant EYDELMAN also tipped one or more of his associates about the deal, who also traded in SMOD securities. In total, between on or about January 31 and April 19, 2011, shortly before the public announcement of the deal, defendant EYDELMAN caused the purchase of approximately 939,150 shares of SMOD stock and approximately 450 call options. In addition, defendant EYDELMAN caused the sale of approximately 1,150 puts.

38.     In total, defendant EYDELMAN, his family member, his associate(s), and several of his brokerage clients, including the CW, and Trader 1 made approximately $1.5 million in illicit profits from trading in SMOD securities based on the Inside Information obtained by defendant METRO.

*The Toshiba-Vital Tender Offer (Announced April 27, 2011)*

39.     In or about late March 2011 or in or about early April 2011, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Toshiba Medical Systems Corp. ("TMSC") to acquire the outstanding shares of Vital Images, Inc. (NASDAQ: "VTAL") in a cash tender offer (the "Toshiba-Vital Tender Offer") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the tender offer.

40.     Shortly thereafter, in or about early April 2011, the CW then passed the Inside Information of the Toshiba-Vital Tender Offer to defendant EYDELMAN, so that he could conduct trades in VTAL securities in advance of the deal announcement.

41.     Based on the Inside Information related to the then-confidential Toshiba-Vital Tender Offer, defendant EYDELMAN illegally traded in VTAL securities on behalf of certain brokerage clients.  In total, between on or about April 4 and April 21, 2011, shortly before the deal was officially announced, defendant EYDELMAN caused the purchase of approximately 19,000 shares of VTAL stock.

42.     In total, defendant EYDELMAN's clients made approximately $39,000 in illicit profits from trading in VTAL securities based on the Inside Information obtained by defendant METRO.

*The Arch Coal-ICO Tender Offer (Announced May 2, 2011)*

43.     In or about late April 2011, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Arch Coal, Inc. (NYSE: "ACI") to acquire the outstanding shares of International Coal Group, Inc. (NYSE: "ICO") in a cash tender offer (the "Arch Coal-ICO Tender Offer") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the tender offer.

44.     Also in or about late April 2011, the CW then passed the Inside Information of the Arch Coal-ICO Tender Offer to defendant EYDELMAN, so that he could conduct trades in ICO securities on behalf of the CW.

45.     Based on the Inside Information related to the then-confidential Arch Coal-ICO Tender Offer, defendant EYDELMAN illegally traded in ICO stock on behalf of several of his brokerage clients, including the CW.  In total, on or about Friday, April 29, 2011, the last trading day before the Monday announcement of the tender offer, defendant EYDELMAN caused the purchase of approximately 68,500 shares of ICO stock.

46.     In total, defendant EYDELMAN's clients, including the CW, made approximately $230,000 in illicit profits from trading in ICO securities based on the Inside Information obtained by defendant METRO.

*The Omnicare-PharMerica Tender Offer (Announced August 23, 2011)*

47.     In or about June 2011, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Omnicare Inc. (NYSE: "OCR") to acquire the outstanding shares of PharMerica Corp. (NYSE: "PMC") in a cash tender offer (the "Omnicare-PharMerica Tender Offer") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the tender offer.

48.     In or about mid- to late June 2011, the CW then passed the Inside Information of the Omnicare-PharMerica Tender Offer to defendant EYDELMAN, so that he could conduct trades in PMC securities on behalf of the CW.

49.     Based on the Inside Information related to the then-confidential Omnicare-PharMerica Tender Offer, defendant EYDELMAN illegally traded in PMC securities on behalf

of himself, certain family members, and several of his brokerage clients, including the CW. In addition, defendant EYDELMAN passed the Inside Information to one or more of his associates. In total, between on or about June 21 and August 22, 2011, just one day prior to the deal announcement, defendant EYDELMAN caused the purchase of approximately 695,650 shares of PMC stock and approximately 1,511 call options.

50.    In total, defendant EYDELMAN, his family members, his associate(s), and several of his brokerage clients, including the CW, made approximately $1.5 million in illicit profits from trading in PMC securities based on the Inside Information obtained by defendant METRO.

*The Wolverine Worldwide-Collective Brands Deal (Announced May 1, 2012)*

51.    In or about early April 2012, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by a consortium made up of Wolverine Worldwide, Inc. (NYSE: "WWW") and certain other companies to acquire Collective Brands, Inc. (NYSE: "PSS") (the "Wolverine Worldwide-Collective Brands Deal") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

52.    Also in or about early April 2012, the CW then passed the Inside Information of the Wolverine Worldwide-Collective Brands Deal to defendant EYDELMAN, so that he could conduct trades in PSS securities on behalf of the CW.

53.    Based on the Inside Information related to the then-confidential Wolverine Worldwide-Collective Brands Deal, defendant EYDELMAN illegally traded in PSS securities on behalf of himself, certain family members, and several of his brokerage clients, including the CW. In total, between on or about April 16 and April 20, 2012, shortly before the deal was officially announced, defendant EYDELMAN caused the purchase of approximately 98,800 shares of PSS stock and approximately 3,655 call options. During this same time period, defendant EYDELMAN also caused the sale of approximately 50 put options.

54.    In total, defendant EYDELMAN, his family members, and his clients, including the CW, made approximately $360,000 in illicit profits from trading in PSS securities based on the Inside Information obtained by defendant METRO.

*The "Company A" Potential Deal*

55.    Sometime in or about 2012, the Law Firm represented a party to a potential corporate transaction involving a public company ("Company A"). In or about May 2012, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding the potential transaction and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of any public announcement of the deal.

56.    In or about mid-May 2012, the CW then passed the Inside Information of the potential deal involving Company A to defendant EYDELMAN, so that he could conduct trades in Company A securities on behalf of the CW.

57.    Based on the Inside Information related to the then-confidential, potential transaction involving Company A, defendant EYDELMAN illegally traded in Company A securities on behalf himself, certain family members, and his brokerage clients, including the CW. In total, between on or about May 14 and October 31, 2012, defendant EYDELMAN caused the purchase of approximately 627,815 shares of Company A stock and approximately 10,825 options, based on Inside Information provided by defendant METRO, via the CW.

58.    The anticipated corporate transaction involving Company A did not go through, causing defendant EYDELMAN and several of his clients, including the CW, to experience significant losses. For example, one of these clients of defendant EYDELMAN ("Client A"), and certain family members of Client A, collectively lost more than $1.3 million.

59.    Defendant METRO himself illegally traded in Company A stock based on the Inside Information he had obtained through his employment at the Law Firm. Specifically, between on or about May 10 and May 11, 2012, defendant METRO purchased approximately 2,720 shares of Company A stock.

*The Tempur-Pedic – Sealy Deal (Announced September 27, 2012)*

60.    In or about August 2012, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Tempur-Pedic International Inc. (NYSE: "TPX") to acquire Sealy Corporation (NYSE: "ZZ") (the "Tempur-Pedic – Sealy Deal") and shared that information with the CW, so that the CW could trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

61.    In or about September 2012, the CW then passed the Inside Information of the Tempur-Pedic – Sealy Deal to defendant EYDELMAN, so that he could conduct trades in ZZ securities on behalf of the CW. The CW also relied on the Inside Information to trade in ZZ stock on behalf of a family member, purchasing approximately 80,000 shares of ZZ stock, and on behalf of the CW's girlfriend, purchasing approximately 61,000 shares of ZZ stock.

62.    Based on the Inside Information related to the then-confidential Tempur-Pedic – Sealy Deal, defendant EYDELMAN illegally traded in ZZ securities on behalf of certain members of his family, as well as on behalf of the CW. Defendant EYDELMAN also tipped another client about the deal, who also traded in ZZ securities. In total, between on or about September 20 and September 25, 2012, a few days before the public announcement of the deal, defendant EYDELMAN caused the purchase of approximately 73,000 shares of ZZ stock.

63.    In total, defendant EYDELMAN, his family members, the CW and another client, the CW's family member, and the CW's girlfriend made approximately $14,000 in illicit profits from trading in ZZ securities based on the Inside Information obtained by defendant METRO.

*The Officemax-Office Depot Deal (Announced February 20, 2013)*

64.    Finally, in or about late January 2013, defendant METRO obtained Inside Information through the course of his employment at the Law Firm regarding plans by Officemax Inc. (NYSE: "OMX") to merge with Office Depot Inc. (NYSE: "ODP") (the "Officemax-Office Depot Deal") and shared that information with the CW, so that the CW could

trade on the Inside Information, either directly or indirectly, in advance of the public announcement of the deal.

65.     Also in or about late January 2013, the CW then passed the Inside Information of the Officemax-Office Depot Deal to defendant EYDELMAN, so that he could conduct trades in OMX securities on behalf of the CW.

66.     Based on the Inside Information related to the then-confidential Officemax-Office Depot Deal, defendant EYDELMAN illegally traded in OMX securities on behalf of himself, certain family members, and several brokerage clients, including the CW.  In total, between on or about January 31 and February 15, 2013, a few days before the press disclosed news of the deal to the public, defendant EYDELMAN caused the purchase of approximately 151,100 shares of OMX stock and approximately 2,010 call options.

67.     In total, defendant EYDELMAN, his family members, and his clients, including the CW, made approximately more than $500,000 in illicit profits from trading in OMX securities based on the Inside Information obtained by defendant METRO.

## THE COCONSPIRATORS REALIZE SIGNIFICANT PROFITS FROM INSIDER TRADING

68.     As described above, defendant METRO, defendant EYDELMAN, the CW, and others realized significant profits, directly or indirectly, by engaging in the insider trading scheme.  The substantial profits realized by the coconspirators through the numerous insider trading transactions are summarized in the chart below (companies marked with an asterisk were represented by the Law Firm).

| TRANSACTION | SECURITIES PURCHASED | APPROX. DATE(S) OF PURCHASES | DATE ANNOUNCED | APPROX. ILLICIT PROFIT |
|---|---|---|---|---|
| Liberty Media to invest approximately $530 million in Sirius XM Radio* | Purchases of approximately 350,000 shares of Sirius stock. | 2/12/2009-2/13/2009 | 2/17/2009 | $212,814 |
| Tyco International Ltd.* to acquire Brinks Home Security | Purchases of approximately 50,916 shares of Brinks stock and approximately 460 call options.  Sales of approximately 160 put options. | 12/29/2009-1/15/2010 | 1/18/2010 | $773,154 |
| People's United Financial Inc.* to acquire Smithtown Bancorp | Purchases of approximately 220,240 shares of Smithtown Bancorp stock. | 7/8/2010-7/15/2010 | 7/15/2010 | $29,010 |

| TRANSACTION | SECURITIES PURCHASED | APPROX. DATE(S) OF PURCHASES | DATE ANNOUNCED | APPROX. ILLICIT PROFIT |
|---|---|---|---|---|
| CNA Financial Corporation* to acquire outstanding shares of CNA Surety Corporation in a cash tender offer | Purchases of approximately 63,750 shares of CNA Surety stock. | 10/20/2010-10/29/2010 | 11/1/2010 | $241,141 |
| Silgan Holdings Inc. to acquire Graham Packing Company Inc.* | Purchases of approximately 25,750 shares of Graham Packaging stock. | 4/11/2011-4/12/2011 | 4/13/2011 | $105,964 |
| Silver Lake* to acquire SMART Modular Technologies | Purchases of approximately 947,150 shares of SMART stock and approximately 450 call options.  Sales of approximately 1,150 put options. | 1/31/2011-4/19/2011 | 4/26/2011 | $1,575,382 |
| Toshiba Medical Systems Corp.* to acquire the outstanding shares of Vital Images, Inc. in a cash tender offer | Purchases of approximately 19,000 shares of Vital Images stock. | 4/4/2011-4/21/2011 | 4/27/2011 | $39,233 |
| Arch Coal, Inc.* to acquire the outstanding shares of International Coal Group, Inc. in a cash tender offer | Purchases of approximately 68,500 shares of International Coal stock. | 4/29/2011 | 5/2/2011 | $231,276 |
| Omnicare Inc. to acquire the outstanding shares of PharMerica Corp. in a cash tender offer | Purchases of approximately 695,650 shares of PharMerica stock and approximately 1,511 call options. | 6/21/2011-8/22/2011 | 8/23/2011 | $1,517,092 |
| Consortium of companies, including Wolverine Worldwide, Inc., to acquire Collective Brands, Inc.<br><br>(Law Firm represented financial advisor(s) to the deal) | Purchases of approximately 98,800 shares of Collective Brands stock and approximately 3,655 call options.  Sale of approximately 50 put options. | 4/16/2012-4/20/2012 | 5/1/2012 | $360,775 |

| TRANSACTION | SECURITIES PURCHASED | APPROX. DATE(S) OF PURCHASES | DATE ANNOUNCED | APPROX. ILLICIT PROFIT |
|---|---|---|---|---|
| Potential corporate transaction involving "Company A" | Purchases of approximately 627,815 shares of "Company A" stock and approximately 10,825 options. | 5/14/2012-10/31/2012 | N/A | N/A |
| Tempur-Pedic International Inc. to acquire Sealy Corporation* | Purchases of approximately 214,000 shares of Sealy stock. | 9/20/2012-9/25/2012 | 9/27/2012 | $14,509 |
| Officemax Inc. to merge with Office Depot Inc.* | Purchases of approximately 151,100 shares of Officemax stock and approximately 2,010 call options. | 1/31/2013-2/15/2013 | 2/20/2013 | $573,332 |
| **APPROX. TOTAL ILLICIT PROFITS** | | | | **$5,673,682** |

## DEFENDANT METRO'S ATTEMPTS TO CASH OUT HIS SHARE OF THE ILLICIT PROFITS

69.     Based on information provided by the CW, in or about October 2013, defendant METRO met with the CW at a New York City restaurant to discuss defendant METRO's desire to procure his share of the illicit profits from the insider trading scheme, as compensation for the numerous tips that he had provided the CW over the past several years.  During the meeting, the CW informed defendant METRO, in substance and in part, that the reinvestment of METRO's original share of the profits, i.e., approximately $7,000, through the insider trading had increased METRO's share to approximately $168,000, as of in or about October 2013.

70.     Shortly after this meeting, defendant METRO sent a text message to the CW stating, in substance and in part, that he wanted the CW to "[c]ash [him] out," which the CW understood to be referring to METRO's desire to obtain his accrued profit share of approximately $168,000.

*The January 13, 2014 Recorded Meeting with Defendant EYDELMAN*

71.     During a meeting consensually recorded by the CW on or about January 13, 2014 (the "January 13th Meeting"), the CW informed defendant EYDELMAN that his source, i.e., defendant METRO, wanted to cash out his share of the profits from their insider trading. Defendant EYDELMAN stated in substance and in part: "Sooo, we got to figure out a way to

get [METRO] some cash, right?"[5]  The CW responded, in substance and in part:  "Well, it's not like I could take it exactly out of the checking account," as to which defendant EYDELMAN affirmed, stating in substance and in part:  "No you got to give him cash, cash."

72.     During this meeting, defendant EYDELMAN and the CW also discussed the last tip that they had received from the law firm source, agreeing that it was the deal involving the "mattress company" – i.e., Sealy.

*The January 28, 2014 Recorded Meeting with Defendant METRO*

73.     During a meeting consensually recorded by the CW on or about January 28, 2014 (the "January 28th Meeting"), defendant METRO met with the CW to discuss, among other things, METRO's purchase of a new home, which the CW – a mortgage broker – was helping facilitate.  During the meeting, defendant METRO pressed the CW to provide him his share of the profits from the insider trading scheme, stating, in substance and in part, "You gotta try to liberate some cash, somewhere, or I'm going to be freakin', flat out," explaining that he needed the money to pay the costs associated with purchasing and renovating his new home.

74.     With respect to whether he had any additional Inside Information to offer, defendant METRO assured the CW, in substance and in part, that "If anything comes up, I'll let you know about it, for sure.  But, I don't know.  Right now it's all been private equity, private equity."  Defendant METRO noted, however, in substance and in part, "I think this year, it's going to be a good year," implying that there likely would be more planned deals involving publicly traded companies of which defendant METRO could apprise the CW.

*The February 6, 2014 Recorded Meeting with Defendant EYDELMAN*

75.     After meeting with defendant METRO, the CW consensually recorded a meeting with defendant EYDELMAN on or about February 6, 2014 (the "February 6th Meeting").

76.     During the February 6th Meeting with the CW, defendant EYDELMAN inquired, in substance and in part, how much money the law firm source was seeking to obtain for providing tips to the CW and EYDELMAN.  The CW speculated, in substance and in part, that the source might be satisfied with "30 [thousand], to pay for [METRO's] closing costs."  In response, defendant EYDELMAN noted, in substance and in part:  "I got 7 [thousand]….That's all I can do, without [my wife] knowing."

### DEFENDANT EYDELMAN PROVIDES $7,000 IN CASH TO COMPENSATE DEFENDANT METRO FOR THE INSIDE INFORMATION

77.     The CW and defendant EYDELMAN met again on or about February 20, 2014 (the "February 20th Meeting").  This meeting also was consensually recorded by the CW.

78.     At the February 20th Meeting, defendant EYDELMAN handed the CW a small plastic shopping bag with a cigar manufacturer's logo on it, stating, in substance and in part:

---

[5] The summaries of the consensually recorded calls that are set forth in this affidavit are based on preliminary draft transcripts prepared from the recordings, which I have reviewed and which are subject to revision.

"Take these cigars [referring to cash in cigar shopping bag], put it to good use." Inside the shopping bag that he handed to the CW, defendant EYDELMAN enclosed $7,000 in cash. The CW inquired how much money was in the bag, stating in substance and in part: "How much is in here? Seven [thousand]? Um, I know it's not a lot, but it will get us back on the information superhighway, you know." Defendant EYDELMAN responded by stating, in substance and in part: "Yeah, I thought you'd contribute," which the CW affirmed by noting, "Yeah, I'm going to contribute some money too. . . . I'm going to make it an even 10 [thousand] for him."

## EFFORTS TO CONCEAL INSIDER TRADING ACTIVITY

79.     In an effort to conceal their illegal insider trading scheme, defendant METRO, defendant EYDELMAN, and the CW relied on various means, including but not limited to:

a.     Defendant METRO obtained and passed the Inside Information but generally refrained from engaging in securities transactions himself.

b.     The CW acted as the middleman in the insider trading scheme, with defendant METRO passing the Inside Information to the CW, who, in turn, passed the information to defendant EYDELMAN. EYDELMAN then used the Inside Information as a basis of lucrative trading decisions for himself, the CW, and others. In this way, there was no direct contact between defendant METRO, the source of the Inside Information, and defendant EYDELMAN, the primary trader.

c.     Defendant METRO provided tips to the CW in person, during one-on-one meetings that usually occurred at a bar or coffee shop. In setting up the meeting, defendant METRO would send a text message to the CW that vaguely inquired, in substance and in part, "Do you want to meet for coffee," which the CW understood to mean that defendant METRO had Inside Information to share.

d.     During their "coffee" meetings, defendant METRO would verbally pass the Inside Information to the CW and/or display for the CW the ticker symbol(s) of the securities to purchase on his cellular telephone. The CW would write just the ticker symbol(s) of the subject issuer(s) on a piece of paper or napkin and later show that piece of paper or napkin to defendant EYDELMAN, displaying it just long enough for EYDELMAN to memorize the ticker symbol(s), but without allowing EYDELMAN to retain the physical evidence. The CW would then fold the paper or napkin, place it into his mouth, and then chew it until the evidence was destroyed.

80.     In addition, defendant EYDELMAN sent the CW "covering" emails that contained false justifications designed to suggest that their trades in the subject securities were based on research, not Inside Information. For example, defendant EYDELMAN sent one of these "covering" emails to the CW on or about September 20, 2012, shortly before commencing trading in the securities of Sealy Corporation (NYSE: "ZZ") based on Inside Information obtained from their law firm source, i.e., defendant METRO. In this email to the CW, defendant EYDELMAN, among other things, acknowledged that ZZ was "less enamored" than other publicly traded mattress companies, that ZZ was not a "wall street favorite," and that at least one investment analyst was even "negative on it," but, nevertheless, defendant EYDELMAN cited

purportedly market-based reasons for purchasing ZZ securities, in order to conceal that their ensuing trading was in fact based on Inside Information.

81.     During the February 6, 2014 Meeting with the CW, defendant EYDELMAN noted recent challenges he has faced in gathering market research to mask the fact that their trading was based on Inside Information, stating in substance and in part: "It's a lot of risk.... I lost my ability to get on every street research note, now.... It's hard to provide documentation for what you're doing. Why you're doing it. . . . I just had a password from a guy. Now it's gone....I had access, and now I don't have it anymore."

## DEFENDANT EYDELMAN'S USE OF ILLICIT PROCEEDS TO FUND CERTAIN PERSONAL EXPENDITURES

82.     Defendant EYDELMAN realized significant personal profits on an ongoing basis from the insider trading scheme and used these unlawful proceeds to make substantial expenditures, including the purchase of a new 2011 Maserati Grand Turismo for approximately $117,700, which he paid for largely in cash. Defendant EYDELMAN also used tens of thousands of dollars of the illicit proceeds of the insider trading scheme to purchase expensive jewelry.

## DEFENDANT EYDELMAN'S USE OF ILLICIT PROCEEDS TO PURCHASE HIS COLTS NECK RESIDENCE

83.     On or about June 1, 2007, defendant EYDELMAN opened an account at Bank of America with an account number ending in 4650 ("BofA Acct. #4650"). Although both defendant EYDELMAN and his wife were listed on the account statements, only defendant EYDELMAN was listed on the signature card for the account.

84.     During the period relevant herein, defendant EYDELMAN's commissions, including commissions he earned for trades based upon Inside Information, were deposited into BofA Acct. #4650.

85.     On or about August 26, 2009, defendant EYDELMAN and his wife purchased a residence located at 3 Fulling Mill Lane, Colts Neck, New Jersey, further identified on the Colts Neck Township Tax Map as Block 8 Lot 6.05 (the "Eydelman residence"). According to the deed, the purchase price of the Eydelman residence was approximately $1,900,000.00. Part of the purchase price was financed through a purchase money first mortgage obtained by defendant EYDELMAN from Bank of America in the amount of approximately $1,000,000.00.

86.     During the period from on or about October 2, 2009 through on or about September 16, 2011, defendant EYDELMAN made regular mortgage payments to Bank of America from BofA Acct. #4650.   Those payments totaled approximately $202,195.00.

87.     On or about September 23, 2011, defendant EYDELMAN obtained a new home mortgage from Met Life Home Loans in the amount of approximately $985,000.00 and satisfied the existing Bank of America first mortgage on the residence. In or about November 2011, a payment on the Met Life Home Loans mortgage was made from BofA Acct. #4650 in the amount of approximately $7,999.44. Subsequently, mortgage payments were made to Select

Portfolio, a mortgage servicing company.  Specifically, two monthly payments were made in or about May and June 2012, both in the amount of $8,797.01, and nine monthly payments were made during the period from in or about September 2012 to February 2014 totaling $76,103.86.

88.     While all the sources of funds used to purchase the Eydelman residence and pay the mortgage payments are not currently known to the affiant, it is apparent that the Eydelman residence was, at least in part, acquired and paid for with proceeds of the offenses charged in Counts 1 through 14 of this Complaint.